WILLIAM E. DAVIS & SONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
William E. Davis & Sons, Inc. v. Commissioner
Docket No. 549-79.
United States Tax Court
T.C. Memo 1981-178; 1981 Tax Ct. Memo LEXIS 570; 41 T.C.M. (CCH) 1263; T.C.M. (RIA) 81178; April 13, 1981. Richard G. Taft and Reid E. Robison, for the petitioner. Charles N. Woodward, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioner's Federal income tax for the taxable years ended June 30, 1974, June 30, 1975, and June 30, 1976, in the amounts of $ 24,142.35, $ 24,330.12 *571 and $ 37,355.19, respectively. Due to concessions by the parties, the sole issue for decision is whether petitioner, for the taxable years in question, may deduct as rent amounts paid to its majority shareholders for the use of land and improvements pursuant to a lease which contained a base rent amount and a percentage of gross sales amount. The respondent disallowed as a deduction in each year of part of the sum paid as rent upon his determination that part of the amount was excessive. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Petitioner, William E. Davis & Sons, Inc., is a corporation organized and existing under the laws of the State of Oklahoma. Its principal place of business at the time the petition was filed herein was located in Oklahoma City, Oklahoma. Petitioner's business commenced in 1953 as a partnership consisting of William E. and Margaret H. Davis (hereinafter the "Davises"). Petitioner was incorporated on August 1, 1959. During the years in issue, the Davises owned 2,160 shares of petitioner, their children owned the remaining 840 shares of *572 petitioner and the Davises managed petitioner's business. At all times material herein, petitioner's business involved the distribution of groceries and related non-food items to institutional customers such as schools, hospitals, restaurants, hotels, clubs, nursing homes, day-care centers and camps throughout the State of Oklahoma and the surrounding area. Petitioner is a distributor of dry and canned foods, frozen foods, produce, paper products, janitorial goods, kitchen goods, meat, and table-top equipment (cutlery, dishes, etc.). Petitioner maintains a fleet of refrigerated, compartmentalized trucks for deliveries. From 1959 to 1969, petitioner's business was located in its old facility. That building contained approximately 18,000 square feet of warehouse and office space. Its ceilings were 13 feet high. In 1963, when petitioner went into frozen foods, it obtained outside storage space and two small portable freezers since there was no room in the old facility for frozen foods. In 1967, petitioner's gross sales were $ 2,266,000. In 1967, petitioner determined that a larger and more sophisticated distribution facility was required to accomodate its expanding business. *573 No facility suitable to its needs existed in Oklahoma at that time. Petitioner decided to construct its own facility. Several potential lenders were contacted on behalf of petitioner in an attempt to borrow the funds necessary to acquire unimproved land and construct a new facility in which petitioner's business would continue. The efforts to borrow funds on behalf of petitioner were unsuccessful. Thereafter, in 1968, the Davises purchased approximately 9.54 acres of unimproved land for $ 58,000 with their own funds. In 1969 the Davises arranged financing, on which they were personally liable, for the purpose of constructing a new distribution facility to lease to petitioner. The land acquired for the new facility was located within the city limits of Oklahoma City, but was removed from the downtown area. During all times material herein, approximately 15 percent of petitioner's business was in the Oklahoma City area and the remainder was in the State of Oklahoma and the fringe areas of surrounding states. The Davises' original investment for the new facility included $ 58,000 in land, $ 360,872 for improvements (of which $ 345,000 was financed) and $ 16,000 for railroad *574 trackage, or a total of $ 434,872. They obtained a $ 345,000 loan for construction of the distribution facility from City National Bank and Trust Company of Oklahoma City, Oklahoma (hereinafter "CNBT" or "interim lender"), pursuant to the terms of a commitment letter from CNBT to the Davises dated May 28, 1969. The commitment letter provided, among other things, that as a condition to the loan the cmpleted premises be leased to petitioner for a term of not less than 20 years for an annual gross rental of not less than $ 60,000. The new facility was built in 1969 with additional improvements made in 1973 and 1974. It was constructed with concrete slab foundation, steel frame, concrete block and rail siding walls, nine loading docks and adequate heating and lighting. The building has a sprinkler and alarm system and has 26-foot-high ceilings to accomodate forklifts. When the building was completed and ready for use, it consisted of a total of 45,907 square feet: 35,416 square feet of dry storage space, 6,864 square feet of cold storage space and 3,627 square feet of office and display space. The Davises executed a Building Lease Agreement with petitioner on March 15, 1969, whereby *575 the Davises leased the new distribution facility to petitioner for a term of 20 years from the first day of the month following completion of construction of the building. The rent payable by petitioner under the lease was $ 5,000 per month ("base rent") and an additional amount of one percent of the annual gross sales of petitioner in excess of $ 4,000,000 per year ("percentage rent"), for the entire term of the lease. Petitioner, the lessee, was required to pay all property taxes, maintenance expenses and costs of insurance coverage for the building for the term of the lease. On June 16, 1969, the Davises executed a promissory note for $ 345,000 payable to CNBT, the interim lender. On the same date, as a condition to granting the loan and as security for payment of the promissory note, the Davises executed an Assignment of Lease and a Conditional Assignment of Rentals to CNBT. Subsequently, CNBT assigned the lease and rights under the Assignment of Rentals to the permanent lender, the Prudential Insurance Company of America. An amendment to the lease on September 26, 1973, increased the base rent to $ 6,650 per month for 17 years commencing November 1, 1973, because 4,920 *576 square feet of cold storage space was added to the premises in 1973. The percentage of gross sales provision remained the same. Another amendment to the lease on June 1, 1974, acknowledged the payment of $ 400 over the base rent for the months of April and May, 1974, due to additional improvements, and increased the base rent to $ 7,275 per month for the remainder of the term of the lease commencing June 1, 1974, because 2,240 square feet of garage space, 1,722 square feet of office space, 646 square feet for a computer room and a driveway and packing area was added to the premises in 1974. All other provisions of the lease remained in effect. Subsequent amendments to the lease have been made but are not relevant to the amount deducted as rent by petitioner during the years in question. Petitioner's sales are normally accomplished by salesmen who travel to customers' places of business and secure orders. Very few sales are generated from petitioner's facility which serves mainly as storage and office space and as a distribution center. Petitioner's gross sales for the fiscal years ending June 30 of the following years were as follows: Year
Gross Sales
1967
$ 2,266,000
1968
2,710,000
1969
3,037,000
1970
3,443,000
1971
3,843,000
1972
4,836,000
1973
6,269,000
1974
7,620,000
1975
7,742,000
1976
9,844,000
*577 Although petitioner's gross sales exceeded $ 4,000,000 for the first time in 1972, no percentage rent was paid for that fiscal year. For the fiscal year ending in 1973 and for each subsequent fiscal year, in addition to the base rent due and owing under the lease and its amendments, petitioner paid the Davises, as lessors, one percent of annual gross sales in excess of $ 4,000,000 as provided by the terms of the lease. A perimeter fence which petitioner placed around a portion of its premises during the fiscal year ending June 30, 1976, at a cost of $ 2,397.30, constitutes a capital asset subject to depreciation with a useful life of three years, with no salvage value. Certain hard surfacing installed by petitioner during the fiscal year ending June 30, 1976, at a cost of $ 5,518, constitutes a capital asset subject to depreciation with a useful life of seven years, with no salvage value. OPINION The issue for decision is whether petitioner, a corporation wholly owned by the Davis family, is entitled to deduct as rent amounts paid during the taxable years in question to its majority shareholders pursuant to the terms of a lease which contains a base rent amount and a percentage *578 of gross sales amount. The respondent partially disallowed the deductions based on his determination that the sums paid were unreasonable in amount. The following chart shows the amounts petitioner deducted as rent in each of the years in issue, the amounts allowed by respondent as rent deductions, and the amounts disallowed by respondent: Rent Deduction
Fiscal Year Ending June 30
Claimed
Allowed
Disallowed
1974
$ 112,296.57
$ 62,000.00
[1] $ 50,296.57
1975
125,387.80
74,700.00
50,687.80
1976
145,898.00
74,700.00
71,198.00
Section 162(a)(3) [2] allows as a deduction amounts which are ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity." *579 The respondent contends that the lease executed between petitioner and the Davises on March 15, 1969, provided for annual rental payments in excess of what would have been required had the parties dealt at arm's-length. He contends that the portion of the claimed rental deductions disallowed by him in each of the taxable years did not in fact represent a payment required to be made by the petitioner for the continued use and possession of the property, but was, in effect, a distribution of petitioner's profits. He apparently challenges the deductibility of the amounts claimed by petitioner as rent because of the identity of interest enjoyed by petitioner and the Davises at the time they entered into the lease which, according to respondent, led to the distribution of corporate earnings under the guise of rent. The petitioner contends that it is entitled to deduct as rent the amounts claimed for the taxable years in issue because the rental payments fixed by the lease, based on a base rent plus one percent of annual *580 gross sales over $ 4,000,000, represented a true and fair rent for the property. Petitioner argues that deductions for rent are not strictly limited by the statute to "a reasonable allowance" as in the case of officers' salaries; that the character of the payments here in question and the fairness of the lease must be judged in light of all the facts and circumstances existing when the lease was executed; that such facts and circumstances evidence an arm's-length transaction and fair dealing; and that since the lease was fair when executed, the amounts paid by petitioner as rent during the years in issue are deductible because the payments were required under the lease as a condition to the continued use and possession of the property. This is so, petitioner concludes, notwithstanding the fact that due to unforeseen and unexpected increases in gross sales, the rental payments in question were actually greater than anticipated at the time the lease was executed. We agree with the petitioner. The allowance of a deduction for rentals in section 162(a)(3) is not subject to a standard of reasonableness such as is found in section 162(a)(1) with regard to salary and other compensation. *581 Imerman v. Commissioner, 7 T.C. 1030 (1946). The question in this case is not whether the claimed rental deductions were reasonable, but whether the alleged rentals were "required" to be paid by petitioner "as a condition to the continued use or possession" of the property instead of something else under the guise of rent. Whether or not the payments by petitioner constituted rent required to be paid is a question of fact. Utter-McKinley Mortuaries v. Commissioner, 225 F.2d 870 (9th Cir. 1955). Petitioner has the burden of proving that respondent's disallowance of a portion of the claimed rent deductions is erroneous. Rule 142, Tax Court Rules of Practice and Procedure.
Although the terms of the lease in question literally required that the amounts deducted by petitioner be paid as rent, our inquiry does not necessarily end there when the circumstances indicate that the parties to the lease were closely related. As we stated in Place v. Commissioner, 17 T.C. 199, 203 (1951), aff'd 199 F.2d 373 (6th Cir. 1952), cert. denied, 344 U.S. 927 (1953), [w]hen there is a close relationship between lessor *582 and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. Manos v. Commissioner, 187 F.2d 734; Stanwick's, Inc., 15 T.C. 556, aff'd (C.A. 4), June 25, 1951; Limerick's, Inc., 7 T.C. 1129, aff'd 165 F.2d 483; Hightower v. Commissioner, 187 F.2d 535. See Commissioner v. Lincoln Electric Co., 176 F.2d 815. The issue, therefore, in this case is whether the lease was reasonable and fair when executed such that unrelated parties dealing at arm's-length would have entered into a similar rental agreement. This determination must be made by closely scrutinizing the provisions of the lease in light of the facts and circumstances known to exist at the time the lease was executed. If the lease was fair and reasonable at the time it was executed, then deductions for rent paid during the term of the lease will be upheld regardless of the fact that the percentage of gross sales *583 provision might produce low rental payments in poorer years and high rental payments in good years. Brown Printing Co. v. Commissioner, 255 F.2d 436 (5th Cir. 1958), rev'g and remanding a Memorandum Opinion of this Court. [3]
Respondent contends, and his expert testified, that a provision for percentage rent in a lease such as is involved in this case is inappropriate. However, according to the testimony of one of petitioner's experts, percentage of gross sales rent provisions have become recognized and accepted practice in leases of commercial properties. We are convinced that the percentage rent provision in the lease here in question was not conceived as a device to funnel corporate distributions to shareholders under the guise of rent. Rather the lease was fair when executed and its rental provisions were reasonable in light of the circumstances under which it was executed. The evidence shows that the Davises had legitimate business purposes in taking title to the property and leasing it to petitioner since petitioner was *584 unsuccessful in its own borrowing efforts. They put a substantial amount of their own net worth at risk in connection with the leased facility. Respondent's expert pointed out that based on a $ 60,000 net rent and a land and building cost of $ 418,872, the property had a basic yield of 14.3 percent. While such a yield might at first appear ample when viewed from the perspective of the year 1969, it must be remembered that the term of the lease was 20 years. For example, an investment in a 14 percent 20-year first mortgage bond of an undiversified closely-held corporation such as petitioner, even a corporation controlled by the investor, would not have been considered an outstanding investment, even in 1969 when the ravages of serious inflation were only beginning to be felt. While it is true that the property will revert to the Davises at the end of the lease term, they also run the risk of the property's suffering substantial obsolescence in the interim. Alternative investments in the equities of mature, exchange-listed corporations, for example, could have had greater appeal. The Davises had no way of expecting with any assurance that the percentage rent provision would ever *585 become operative, but in our judgment the provision was a legitimate "sweetener" for the financial risk they assumed. Furthermore, the base rent essentially protected and was required by the permanent lender, and the "at risk" nature of the Davises' obligation to the lender posed a continuing potential threat to their personal solvency, particularly in light of the partial special-purpose nature of the building. At no time subsequent to the initiation of the lease did petitioner or the Davises attempt to change the terms of the lease to maximize the benefits to themselves of the percentage rent provisions, and we are not willing to indulge in the luxury of hindsight to criticize the substantial benefits which accrued to them, undoubtedly due in substantial part to Mr. Davis' business acumen in the management of petitioner's business. We might also draw attention to the fact that the rent, although deductible by petitioner, would constitute "unearned" income in the hands of the Davises, and therefore was potentially taxable to them in brackets as high as 70 percent, as contrasted with the maximum corporate rate of approximately 48 percent in the years in question. Petitioner's *586 two experts testified that the percentage rent of one percent of gross sales over $ 4,000,000 was fair when the lease was executed and in conformity with percentage rent agreements utilized with similar properties. They testified that a percentage rent provision is commonly utilized in commercial leases to protect lessors against inflation. They further stated that the base rent provision of the lease and the rate of return to the lessors comported with leases of similar properties and that in their opinion the lease would have been entered into by parties dealing at arms-length. Viewing their testimony as a whole, we agree with the opinions of petitioner's experts. After carefully examining the evidence and record before us, we are convinced that petitioner has sustained its burden of proving that the lease was entered into in an arm's-length transaction and that the payments made by petitioner during the taxable years in issue, pursuant to the terms of the lease, were in fact required to be made as a condition to the continued use and possession of the property. Therefore, we hold that the amounts claimed by petitioner as a deduction for rent during each of the taxable years *587 in issue constitute an ordinary and necessary business expense and are deductible under section 162(a)(3). Due to concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. Although the parties stipulated that the amount of rent disallowed by respondent for 1974 was $ 54,296.57, the correct amount, as reflected in the deficiency notice, is as stated above.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise specifically indicated.↩
3. See also West Virginia Tractor and Equipment Co. v. Commissioner↩, a Memorandum Opinion of this Court dated Dec. 31, 1953.